## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO: 1-22-CV-22606-JLK

MELANIE E. DAMIAN, as
Receiver for On Point Global LLC, *et. al.*,

      Plaintiff,

v.

HOLLY MELTON,
BAKER & HOSTETLER LLP, and
CROWELL & MORING LLP,

      Defendants.

_____/

## **AMENDED COMPLAINT**

    Plaintiff, Melanie E. Damian, in her capacity as the Court-appointed Receiver ("Plaintiff or the "Receiver") for On Point Global, LLC, *et al.*[1] (the "Receivership Entities"), sues Defendants, Holly Melton, Baker & Hostetler LLP, and Crowell & Moring LLP (collectively, the "Defendants") for legal malpractice and states as follows:

---

[1] The Receivership Entities include: On Point Global LLC; On Point Employment LLC; On Point Guides LLC f/k/a Rogue Media Services LLC; DG DMV LLC; On Point Domains LLC; Final Draft Media LLC; Cambridge Media Series LLC f/k/a License America Media Series LLC; Issue Based Media LLC; Bella Vista Media Ltd. also d/b/a BV Media; Carganet S.A. also d/b/a G8 Labs; Direct Market LLC; Bluebird Media LLC; Borat Media LLC; Bring Back the Magic Media LLC; Chametz Media LLC; Chelsea Media LLC; Coinstar Media LLC; Domain Development Studios LLC; Domain Dividends Media LLC; Eagle Media LLC; Falcon Media LLC; GNR Media LLC; Island Media LLC; Leatherback Media Group LLC; Macau Media LLC; CEG Media LLC f/k/a Matzoh Media LLC; MBL Media Ltd. Inc.; Orange and Blue Media LLC; Orange Grove Media LLC; Panther Media LLC; Pirate Media LLC; Pivot Media Group LLC; PJ Groove Media LLC; Sandman Media Group LLC; Shadow Media LLC; Skylar Media LLC; Slayer Billing LLC; Spartacus Media LLC; Very Busy Media LLC; Wasabi Media LLC; Yamazaki Media LLC; Bronco Family Holdings LP a/k/a Bronco Holdings Family LP; BAL Family LP; Cardozo Holdings LLC; 714 Media Ltd.; Mac Media Ltd.; License America Management LLC; License America Holdings LLC; and Blackbird Media LLC.

## INTRODUCTION

1.      As set forth below, the Receiver brings this claim against each of the Defendants because they were each asked at various times between 2017 and 2019 to provide a comprehensive compliance review of the businesses and the websites operated by the Receivership Entities and at each occasion breached its or her duty to fully, fairly, and competently represent and advise the Receivership Entities in connection with the implications of the FTC Act and a 2014 Permanent Injunction and instead provided superficial advice or approval of the deceptive business and websites that were found by this Court to be violative of the FTC Act and a 2014 Permanent Injunction which resulted in substantial damage to the Receivership Entities.

2.      Among the Receivership Entities are On Point Global LLC, MBL Media Ltd., PBJ Media LLC, Rogue Media Services LLC, and Direct Market LLC (collectively, the "OPG Entities", further, this term will refer to On Point Global LLC's overall business including its subsidiaries engaged in carrying out On Point Global LLC's business model).  The OPG Entities retained the Defendants to guide and counsel them concerning the legal risks and implications of the OPG Entities' business models and websites and whether their business models and websites complied with applicable laws, including the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b).

3.      The Defendants knew or should have known that the OPG Entities' business models and websites as then operating contravened federal consumer protection laws, including the FTC Act, and they negligently failed to warn the OPG Entities that they should make changes and/or modify their business practices to be in compliance with these federal consumer protection laws and prior Court Orders effecting an OPG principal and thereby OPG or, in the alternative, cease operations or cease certain operations.

4.      As more fully set forth herein, the Defendants as attorneys for the OPG Entities owed a duty to the OPG Entities to counsel them in a reasonably prudent manner consistent with applicable law.  Defendants breached their duties as attorneys in several ways, including, but not limited to, failing to gain a complete understanding of the OPG Entities' business models, websites, and operations and failing to competently counsel the OPG Entities regarding the legal risks of continuing to operate as they did.

5.      Defendants' breaches of their duties as attorneys for the OPG Entities caused or was a substantial contributing factor in causing significant injuries to the OPG Entities.  Further, the Defendants' failure to properly counsel the OPG Entities on compliance matters caused the OPG Entities to incur millions of dollars in Receivership and attorneys' fees, claims process fees, and contempt sanctions.

6.      The Receiver brings this action to recover the losses incurred by the OPG Entities resulting from Defendants' breaches of their duties.

## THE UNDERLYING ENFORCEMENT ACTION, CONTEMPT PROCEEDINGS AND RECEIVERSHIP

7.      On December 13, 2019, the FTC commenced an enforcement action against the Receivership Entities and individual Receivership Defendants Burton Katz, Brent Levison, Elisha Rothman, Robert Zangrillo, and Christopher Sherman, styled *Federal Trade Commission v. On Point Global LLC, et al.*, Case No. 19-25046-cv-Scola (the "FTC Enforcement Action") in the United States District Court for the Southern District of Florida (the "Receivership Court").  *See* Complaint [ECF No. 1] filed in the FTC Enforcement Action (the "FTC Complaint").  Shortly thereafter, in February 2020, the FTC sought contempt sanctions in a related matter styled *Federal Trade Commission v. Acquinity Interactive, LLC, et al.*, Case No. 14-60166-cv-Scola (the "Acquinity Matter").

8.    The FTC Complaint alleged that the OPG Entities were operating certain paid guide, concierge services, and Freemium guide websites that deceived consumers into believing that they were dealing with government agencies and/or purchasing services rather than guides.

9.    On December 13, 2019, the Court entered an Order Granting Ex Parte Temporary Restraining Order and Order to Show Cause (the "TRO") in the FTC Enforcement Action.  *See* FTC Enforcement Action at ECF No. 17.  Pursuant to the TRO, the Defendants' assets were frozen, all records of Defendants' activities and assets were ordered to be preserved.  *See id.*

10.   The Receiver was initially appointed in the FTC Enforcement Action by the Receivership Court pursuant to the TRO as extended by the Order Granting Motion for Preliminary Injunction dated January 14, 2019 ("Preliminary Injunction") (collectively, the "Receivership Orders").  *See* FTC Enforcement Action at ECF No. 126.

11.   Soon after the Receiver's appointment, the Receiver, with the assistance of her new compliance counsel, discontinued all paid guide websites and corrected the non-compliant websites, including concierge services and Freemium sites, and submitted them to the Court for approval.  *See* Receiver's Motion to Approve Modified Templates for Entity Defendants' Websites at FTC Enforcement Action at ECF No. 169.  The Court approved the new website templates after substantial changes were made to bring them into compliance.  *See* Order on the Receiver's Motion to Approve Templates at FTC Enforcement Action at ECF No. 234.

12.   The Court extended the Receivership based on the contempt proceedings in the "Acquinity Matter" (*see infra* for more details regarding the Acquinity Matter).  *See* Acquinity Matter at ECF No. 135.  On August 13, 2021, based on a Supreme Court ruling overturning prior Eleventh Circuit precedent, the Court determined that the FTC could only obtain injunctive relief in the FTC Enforcement Action [ECF No. 484].  On that same date, the Court entered a Preliminary

Injunction [ECF No. 175] in the Acquinity Matter.  The Acquinity Matter Preliminary Injunction, as modified by the Amended Preliminary Injunction [ECF No. 177], expressly provides that it does not limit any right, duty, or obligation of the Receiver set forth in the FTC Enforcement Action Preliminary Injunction [ECF No. 126].  *See* Acquinity Matter at ECF No. 175 at VII.

13.    Several Receivership Defendants, including individual Receivership Defendants and Receivership Entities, and the FTC filed cross motions for summary judgment in the FTC Enforcement Action and motions for a summary contempt ruling in the Acquinity Matter.

14.    On September 29, 2021, the Receivership Court, in the FTC Enforcement Action, made a final determination contrary to the advice the Defendants had provided to the OPG Entities, holding, among other things, that the OPG Entities' "paid-guide" and "Freemium" websites violated Section 5(a) of the FTC Act.  *See* FTC Enforcement Action at ECF No. 528.

15.    The Court also held that certain Receivership Entities, "the Dragon Global Defendants"[2], were innocent investors in the OPG Entities and thus were not operating a common enterprise with the OPG Entities or otherwise participating in the violations of the FTC Act.  The Court did not rule on the individual liability for injunctive relief of Receivership Defendants Sherman, Rothman and Zangrillo, leaving that matter for trial.

16.    On that same date, in the Acquinity Matter, the Court granted in part the FTC's motion for summary contempt, finding the OPG Entities in contempt of the Acquinity Order.  *See* Acquinity Matter at ECF No. 225 at §(B)5.  The Court held that innocent investors, the Dragon Global Defendants, did not have notice of the prior Acquinity Order and could not be held in contempt for violation of that order.  *See id*. at §(B)4.  The Court did not rule on the appropriate

---

[2] The "Dragon Global Defendants" comprise Dragon Global LLC, Dragon Global Management LLC, On Point Capital Partners LLC, and Dragon Global Holdings LLC's.  *See* FTC Enforcement Action at ECF No. 528

amount of contempt sanctions, in the Acquinity Matter, reserving the appropriate measure of damages to be determined at the consolidated non-jury trial on the matter. *See id.* at §(D).

17.     On November 16, 2021, after the consolidated non-jury trial, the Receivership Court entered its Verdict and Order Following Non-Jury Trial (the "Verdict"), holding certain of the OPG Entities and Receivership Defendants Katz and Levison jointly and severally liable for compensatory contempt damages and determining that the appropriate measure of damages for the OPG Entities' contempt is the maximum of $102,768,235.47, representing $85,470,480.60 in gross receipts minus refunds and chargebacks from three years of paid guide sales plus $17,297,754.87 in gross receipts from one year of selling and monetizing data consumers had provided on the Freemium websites. *See* FTC Enforcement Action at ECF No. 579.

18.     The Court also issued a Permanent Injunction contained within the Order on Cross Motions for Summary Judgment and an Amended Injunction which binds the company to strict compliance provisions beyond those required by the FTC regulations or any other consumer protection law. *See* ECF Nos. 528 (Permanent Injunction) and 582 (Amended Permanent Injunction). The Permanent Injunction was later amended upon the Receiver's Motion. *See* Receiver's Motion at ECF 558.

19.     The Court held that Receivership Defendant Robert Zangrillo was not liable because although he served as Chairman of the Board for the OPG Entities, he did not have sufficient knowledge or involvement in daily operations and thus did not directly participate in the deceptive conduct at issue in the FTC Enforcement Action. *See id.* at p. 34.

20.     At all material times, the OPG Entities had at least seven other innocent shareholders holding 48.48% of the ownership interests in the Entities.

21.     The Verdict directed the Receiver to devise and propose to the parties and the Court a claims administration process and plan of distribution (the "Claims Process").  *See* ECF No. 579 at p. 44.  The Court approved the Claims Process as set forth in the Receiver's Motion to Approve Noticing and Claims Administration Process and Plan of Distribution [ECF No. 596] and in the Court's Order approving the Claims Process [ECF No. 607].

22.     The Receiver has nearly completed the Claims Process, including the noticing process and review of submitted claims, made determinations as to allowed and disallowed claims, and designed the reconsideration process for claimants with disallowed claims.

23.     The Receiver has initially determined that the total amount of allowed claims against the Receivership Entities is $8,471,711.74, which amount will increase upon the conclusion of the disallowed claims reconsideration process and FTC audit.

24.     The Receiver created a fiduciary reserve account (the "Reserve Account") holding $30 million to fund the administration of the Claims Process and all resulting distributions.  The Receiver anticipates the cost of the Claims Process alone will exceed $10 million.

25.     As such, including previous amounts paid without a formal claim, pursuant to the Verdict [ECF No. 579], the Court's compensatory contempt sanction has cost the Receivership Entities at least $19,268,579.26.

26.     In addition, as a result of the Receivership, the Receivership Entities have incurred professionals' fees and costs totaling at least $3,106,753.

27.     None of the Receivership Entities previously represented by Defendants filed an appeal of the appointment of the Receiver.[3]   The appointment of the Receiver has not been vacated

---

[3] Only the Dragon Global Defendants pursued an appeal of the Receivership Orders in *FTC v. On Point Capital Partners, LLC*, 17 F. 4d 1066 (11th Cir. 2021).

or terminated or otherwise altered as to the Receivership Entities holding the malpractice claim against Defendants prior to the filing of this Amended Complaint.

## THE PARTIES

The Plaintiff/Receiver

28.     Pursuant to the Receivership Orders in the Enforcement Action and the Acquinity Matter, the Receiver assumed "full control" of the Receivership Entities, with standing to investigate and prosecute claims against third parties including any claims in contract, law, tort, and equity.   The Receiver's role was expanded by the Preliminary Injunction, Amended Preliminary Injunction, and Verdict entered in the Acquinity Matter.

29.     The Verdict, entered in both the FTC Enforcement Action and the Acquinity Matter, further defined and expanded the Receiver's powers, duties, and responsibilities to include development and implementation of the Claims Process to assure that the compensatory purposes of a civil contempt sanction entered against, among others, the OPG Entities will be met.  *See* FTC Enforcement Action at ECF No. 579.

The Defendants

30.     Defendant Baker & Hostetler LLP ("Baker") is and was, at all times material hereto, a limited liability partnership, operating as an international law firm with sixteen offices throughout the United States, including an office in New York, New York and an office in Orlando, Florida.

31.     Defendant Crowell & Moring LLP ("Crowell") is and was, at all times material hereto, a limited liability partnership, operating as an international law firm with offices throughout the United States and around the world, including an office in New York, New York.

8

32.     At all times material hereto, Defendant Holly Melton ("Melton") was an attorney licensed to practice law and practicing law in the State of New York.  At all times material hereto until October 21, 2018, Defendant Melton practiced with and on behalf of and was employed by Defendant Baker, and from approximately October 22, 2018 to the present, Defendant Melton has been employed as a partner level attorney and has practiced law with and on behalf of Defendant Crowell.  At all times material hereto and in her employ by Baker and Crowell, Defendant Melton provided legal services through Baker and Crowell to the OPG Entities in South Florida.

33.     At all material times between May 2017 and the present, Defendant Melton and several other associates and partners identified below who performed services for and provided legal counsel to the OPG Entities were acting within the course and scope of their duties and responsibilities as partner and associate level attorneys employed by Baker and Crowell respectively and were acting with Baker's and Crowell's respective approval and consent.

34.     As more fully detailed herein, the Defendants provided legal services to the OPG Entities in connection with, among other issues, whether the OPG Entities' business models and websites complied with Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over this action pursuant to Title 28, United States Code, Section 754, and the principles of ancillary or supplemental jurisdiction under Title 28, United States Code, Section 1367.

36.     This Amended Complaint is brought to accomplish the ends sought and directed by the Receivership Court, which, among other things, appointed Plaintiff as Receiver and authorized her to commence actions to recover assets and pursue claims of the Receivership Entities arising from both the FTC Enforcement Action and the Acquinity Matter.

9

37.     All of the Defendants are subject to the jurisdiction of this Court pursuant to Section 48.193(1)(a)(2), Florida Statutes, which provides for jurisdiction over a nonresident who "commit[s] a tortious act within [Florida]", because, as more fully shown by the facts set forth below, Defendants committed tortious acts of legal malpractice in Florida via interstate communications and personal visits to Florida.  Indeed, Defendants provided legal advice in Florida, which was relied upon in establishing and furthering the OPG Entities' business models, operations, and websites, including providing advice to the OPG Entities through their principals located in South Florida.  The Defendants' tortious acts caused injuries to the OPG Entities and to the consumers of the OPG Entities' websites and operations within the jurisdiction.

38.     Further, each of the Defendants received transfers of funds, either directly or indirectly, from the OPG Entities, which were operating, conducting, engaging in, and carrying on business operations or business ventures in, among other locations, the Southern District of Florida.  Defendants' malpractice directly caused injury and damage to the OPG Entities within Florida as evidenced by the FTC Enforcement Action and the Acquinity Matter both prosecuted in the Southern District of Florida.

39.     Defendants have sufficient minimum contacts with the State of Florida such that the exercise of personal jurisdiction comports with Constitutional due process requirements. Specifically, and not exclusively, Defendant Melton provided legal advice directly to individuals and entities in South Florida, for over two years, in connection with the advice at issue in this case, and Defendant Melton's legal advice caused and contributed to violations of the FTC Act in Florida, caused and contributed to the substantial judgment and resulting damages to the OPG Entities which was ordered in the Southern District of Florida, and directly impacted consumers in South Florida.  At all relevant times, Melton was a partner at Baker or Crowell, responsible

within her firm for the OPG Entities' legal representation, and she was well aware that they were a large conglomerate based in and operating out of South Florida.  As detailed below, Melton purposefully availed herself of the privilege of conducting business by providing legal advice directed to the OPG Entities in South Florida in person, by email, by mail and by telephone.

40.     In addition, Defendant Melton has a national law practice providing legal services in many states and local jurisdictions without any geographic limitation to New York.  Indeed, Melton's profile on Crowell's website states that "Holly focuses on counseling advertising, marketing, and consumer goods and services companies in complex investigations and enforcement matters initiated by the Federal Trade Commission, state attorneys general, and other local law enforcement agencies.  Holly has substantial litigation experience defending clients against consumer class actions.  She also represents clients in initiating and defending against competitive challenges to advertising and marketing practices before the National Advertising Division of the Council of Better Business Bureaus, and in federal court."    *See* https://www.crowell.com/professionals/Holly-Melton.    Moreover, on its website, Crowell recognizes that it intentionally seeks out and serves clients all over the world, "[w]e have continued to diversify our practice mix to reflect the dynamic business environment and expanded our footprint in the U.S. and in international markets to support our global client base", including Miami, Florida.  *See* https://www.crowell.com/About/Overview.

41.     Defendants Baker[4] and Crowell[5], in addition to providing legal advice to the OPG

Entities in South Florida, have numerous partners who are members of the Florida Bar, have filed,

---

[4] Defendant Baker is an international law firm with an office in Orlando, Florida with at least 58 attorneys practicing law and providing legal services in Florida.  So, it regularly conducts business in Florida.  "BakerHostetler, one of the nation's largest law firms, represents clients around the globe.  With offices coast to coast, our more than 1,000 attorneys….".  *See* https://www.bakerlaw.com.  Moreover, Defendant Baker employs Linda Goldstein who also served as FTC compliance counsel to the OPG Entities.  Ms. Goldstein has a national practice not limited to any geographic region and she regularly provides legal services in Florida.  Indeed, "Linda Goldstein is widely recognized as one of the leading advertising lawyers in the country.  She regularly provides advertising counsel and regulatory advice to leading Fortune 500 and Fortune 100 companies in many different product and service categories, …. She represents clients in investigative and enforcement proceedings brought by the Federal Trade Commission, state attorneys general, district attorneys, and other federal and state agencies…."  *See* https://www.bakerlaw.com/LindaAGoldstein.  Ms. Goldstein regularly travels to Florida to market her legal services as an expert on FTC matters.  In March 2022, Ms. Goldstein traveled to Miami, Florida to provide a presentation on FTC enforcement tactics and to market herself in South Florida as an expert in that area of law.  *See* https://www.bakerlaw.com/Linda-Goldstein-Discusses-FTC-Targets-at-PDMI-East.  Then, a few months later, in June 2022, Ms. Goldstein returned to Florida and on two separate occasions gave presentations on compliance and strategies for evading the FTC and to market herself as an expert in Boca Raton, Florida and then in Orlando, Florida.  *See* https://www.bakerlaw.com/Linda-Goldstein-Discusses-FTC-Compliance-at-DSA-Engage-2022 and https://www.bakerlaw.com/Linda-Goldstein-Discusses-Subscription-Based-Marketing-at-SubSummit-2022

[5] Defendant Crowell advertises itself as "an international law firm with offices in the United States, Europe, MENA, and Asia" without limiting the geographic region of its practice to New York.  *See* https://www.crowell.com/NewsEvents/PressReleasesAnnouncements.  In addition, Crowell regularly performs and has performed legal services for clients in Florida, showing a consistent pattern of conducting business in Florida.  Indeed, Crowell continuously provides legal services throughout Florida, "[w]e currently represent Fortune 50 company in Florida administrative challenge to remedial action plan relating to contamination at former manufacturing facility near Sarasota, Florida".  *See* https://www.crowell.com/Practices/Environment-Natural-Resources/Contaminated-Lands-Hazardous-Waste.  Crowell "[r]epresents a medical device manufacturer in product liability actions in Florida…."  *See* https://www.crowell.com/Professionals/Clifford-Zatz.  Crowell has "[d]efended a major defense contractor in lawsuits in Florida in which more than 300 plaintiffs alleged personal injury . . . ." *See id*.  Moreover, Crowell has a history and pattern of providing legal services in Florida, "[w]e have defended a Class I freight railroad in a wide range of putative class actions in federal and state courts in Florida…."  *See* https://www.crowell.com/Practices/Class-Actions/Railroad-Class-Actions.  Crowell "[w]on a two-week trial before a Florida administrative law judge, defeating a community's challenge to an environmental site assessment" and "[d]efended a breach of contract action in a jury trial in federal court in Tampa, Florida".  *See id*.  Crowell's lawyers "have prosecuted and defended cases throughout the country, including . . . Florida . . . ."  *See*

litigated, and defended numerous significant lawsuits in South Florida, and have acted through Defendant Melton, a partner of each firm, when Defendant Melton engaged in the acts described above and herein.

42.    In addition, Defendants Baker and Crowell commenced their business relationship with the OPG Entities pursuant to retainer agreements that were signed by the OPG Entities in Miami, Florida.  Defendants Baker and Crowell also sent the OPG Entities invoices for services rendered to the OPG Entities in Miami, Florida and those invoices were paid from accounts held in Miami, Florida.

43.    Florida law provides that "telephonic, electronic, or written communications into Florida may form the basis for personal jurisdiction under section 48.193(1)(b) if the alleged cause of action arises from the communications," *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002), and that section (1)(b) (re-numbered 48.193(1)(a)(2)) can confer jurisdiction over a nonresident defendant whose out-of-state tort causes injury in Florida.  *See Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 257 (11th Cir. 1996).  Defendant Melton, while employed at Baker and then at Crowell, regularly communicated with the OPG Entities by sending them letters and emails and

---

https://www.crowell.com/Practices/Retail-Consumer-Products/Bankruptcy.    "With lawyers practicing across the country, we have defeated class certifications and defended numerous "one off" and multi-jurisdiction class actions across the United States, including in Alabama, California, Florida . . . ." *See* https://www.crowell.com/Practices/Class-Actions. Crowell "serves as national counsel" to well-known retailers and the firm's lawyers "have litigated cases across the country, including in Arkansas, Arizona, California, Florida...." *See* https://www.crowell.com/Practices/Retail-Consumer-Products/Commercial-Lease-Disputes. Crowell's bid protest lawyers "have litigated directly in numerous states throughout the country, including, but not limited to, . . . Florida . . . ." *See* https://www.crowell.com/practices/government-contracts/bid-protests.    Moreover, Crowell provides legal services in the Southern District of Florida.  Crowell represents "a business support services company on an agency protest of unduly restrictive solicitation requirements in Miami Port Authority procurement" and "a transportation services company in a protest regarding a USN solicitation for tug and towing services at Port Everglades Florida." *See* https://www.crowell.com/Practices/Transportation/Ports-Shipping.

telephoning them at their office in Miami, Florida.  Those letters, emails and telephone calls were used to provide Defendant Melton's legal opinion that there was low legal risk in the OPG Entities' business model, among other incorrect advice, subject of this legal malpractice lawsuit.

44.    Specifically, on March 20, 2017, while employed by Baker, Melton emailed a training deck for Direct Market, LLC to Brent Levison located at the OPG Entities' office in Miami, Florida wherein Melton details her analysis, policies and training plan that was provided to the OPG Entities concerning compliance with Section 5 of the FTC Act with respect to disclosures and deceptive practices, among other compliance issues.  Melton's failure to provide an appropriate compliance analysis as contained in the training deck and as presented to the OPG Entities constitutes legal malpractice that led to the entry of the Verdict in the FTC Enforcement Action and the Acquinity Matter contempt sanctions against those Entities.  The advice provided in that training deck sent to Miami, Florida was tortious because it breached the standard of care required by attorneys practicing in the field.

45.    In addition, Defendant Melton traveled to South Florida to the OPG Entities' offices on March 21, 2017 and provided legal compliance training on the policies and procedures concerning misleading and deceptive advertising practices and Section 5 of the FTC Act.  This compliance training and advice is the subject of this legal malpractice lawsuit.  Melton committed this tortious conduct in person in Miami, Florida.  During this in-person training session, Melton was employed by Baker.  As such, Melton committed certain of the breaches of the standard of care while she was physically present in Florida.

46.    Then, on May 15, 2017, Melton, while employed by Baker, mailed a letter to Direct Market, LLC at its physical office in Miami, Florida wherein Melton discusses her analysis of the OPG Entities' new business model offering services regarding processing of vehicle registration

renewals and making representations concerning government services.  The letter states that the business model provides a low legal risk for the companies and Baker's legal research did not uncover any legal challenges in connection with private legal actions or governmental enforcement agencies.  Melton and Baker's failure to provide appropriate compliance review regarding representations concerning government services in breach of their duty of care to the OPG Entities led to the entry of the Verdict in the FTC Enforcement Action and the Acquinity Matter contempt sanctions against those Entities.  The advice provided in that May 15th letter sent to Miami, Florida was tortious in and of itself and is the subject of this malpractice lawsuit.

47.     On October 4, 2017, Melton while employed by Baker sent an email to Charlie Eissa, who was located in the OPG Entities' physical office in South Florida, assuring him that Baker was performing a large-scale compliance review of the OPG Entities assembling a team of experts to ensure the total compliance that the OPG Entities sought to achieve.  Melton and Baker's failure to provide the appropriate level of compliance review, in breach of their duty of care to the OPG Entities, led to the entry of the Verdict in the FTC Enforcement Action and the Acquinity Matter contempt sanctions against those Entities.

48.     On October 19, 2017, Melton sent to Brent Levison an email to the OPG Entities' offices in Miami, Florida, attaching a Memorandum that outlined the changes suggested to bring the Freemium sites into compliance.  The OPG Entities made the suggested changes to the sites. The advice provided in the October 19, 2017 Memorandum fell below the standard of care and Melton and Baker's failure to provide an accurate compliance review of the Freemium sites, in breach of their duty of care to the OPG Entities, led to the entry of the Verdict in the FTC Enforcement Action and the Acquinity Matter contempt sanctions against those Entities.  The

advice provided in that October 19th email and Memorandum sent to South Florida was tortious in and of itself and is the subject of this malpractice lawsuit.

49.     On November 2, 2018, Melton sent to Brent Levison at the OPG Entities' office in Miami, Florida Crowell's engagement letter so she could continue her representation of the OPG Entities now that she had moved to Crowell.  The letter does not provide a choice of law or venue provision for malpractice actions.  The letter does state that Melton is primarily responsible for the OPG Entities as clients.

50.     On April 10, 2019, Melton, while employed by Crowell, sent to Brent Levison an email to the OPG Entities' offices in Miami, Florida, attaching a Memorandum that outlined the scope of the continuous compliance review that Melton and Crowell would perform for the OPG Entities.  The Memorandum states that "we ("Crowell") have designed the following program which is specifically designed to help ensure that OnPoint Global, LLC ("OnPoint") complies with applicable laws and regulations and thereby reduces the risk of governmental investigations, consumer claims and partner indemnity demands.  Pursuant to our discussion, this initial compliance monitoring program will focus on the Freemium web properties."

51.     On May 17, 2019, Melton's associate at Crowell sent an email to the OPG Entities, at their offices in Miami, Florida, including a chart containing Crowell's review of all the Freemium websites.  As outlined in the Memorandum, forty-four of the forty-eight Freemium websites on the chart state "Reviewed - no comments" and thus had no suggested changes.  The websites that Melton and Crowell failed to revise include the Section 8 housing, food stamp, unemployment and other government benefit sites subject of the FTC Enforcement Action and of the contempt sanctions imposed in the Acquinity Matter – the very websites that the Court found

to be deceptive to consumers and in violation of the FTC Act.  The negligent review of websites and advice of counsel provided is the subject of this legal malpractice lawsuit.

52.     On July 19, 2019, Melton sent an email to Brent Levison at the OPG Entities' office in Miami, Florida concerning an analysis and revision of the third-party data sharing and SMS permission language from one of the section 8 housing websites subject of the FTC Enforcement Action.  Melton's analysis does not warn the OPG entities not to engage in data sharing or use. The sharing of data from Freemium sites such as section 8 housing led to the FTC Enforcement Action and the contempt sanctions imposed in the Acquinity Matter to compensate consumers whose personal information was shared after they entered it into the deceptive Freemium sites.

53.     In addition, Melton conducted a second in-person legal training session in Miami, Florida, on March 11, 2019, while Melton was employed by Crowell.  Melton's failure to provide an appropriate compliance analysis as contained in the training deck and as presented in person to the OPG Entities constitutes a breach of the standard of care that led to the entry of the Verdict in the FTC Enforcement Action and the Acquinity Matter contempt sanctions against those Entities. Melton committed the conduct complained of while she was physically present in Florida.

54.     As alleged *supra*, all Defendants regularly conduct business and provide legal advice throughout Florida such that each has sufficient minimum contacts with Florida to satisfy due process concerns.  And in the case at hand, Defendants provided the legal advice giving rise to the legal malpractice claim in Miami, Florida and thereby committed tortious acts in Miami, Florida that caused injury in Miami, Florida.  Therefore, Defendants should have expected that they could be sued in the Southern District of Florida for their misconduct with respect to the OPG Entities.  This Court has personal jurisdiction over all Defendants.

55.    Venue is also proper in the Southern District of Florida pursuant to Title 28, United States Code, Section 1391(b), because a substantial part of the acts or omissions giving rise to the acts described and the claims set forth in this Complaint occurred in the Southern District of Florida.  And, venue is proper because this case is ancillary to the Receivership appointment in the Enforcement Action and the Acquinity Matter.

## GENERAL ALLEGATIONS

### Background of the OPG Entities and their Operations

56.    The OPG Entities are owned by ten different entities, a majority of which are innocent shareholders that were not involved in the business operations that led to the FTC Enforcement Action.  Specifically, the innocent shareholders owning 48.48% of the Receivership Entities are On Point Capital Partners, LLC, DG On Point, LLC, Adam Rioux, Mark Roah, Jason Hiroshima and RBC Universal, LLC, and Ventures On Point, LLC.  Avenue I, a subsidiary wholly owned by the OPG Entities, operates a legitimate internet advertising business line under the OPG Entities and was and is a source of significant legitimate revenue for the OPG Entities.  Avenue I was not named a defendant in the FTC Enforcement Action or in the Acquinity Matter nor was its business the subject of any of the FTC's allegations.

57.    From approximately January 2017 to December 2019, among other lines of businesses not relevant to the instant claims, the OPG Entities created and operated approximately ninety-seven (97) "paid guide" businesses via certain "portal sites" and approximately one hundred and four (104) "transaction sites," consisting of websites with URLs that often contained the name of a state, a keyword related to a government-related service, and a ".org" top-level domain—for example, "floridadriverslicense.org." Certain of these paid sites purported to provide concierge

services for government agencies such as postal address changes, Texas car registration renewal, and driver's license renewal.

58.     Consumers were directed to these "paid guide" sites when looking for information on how to obtain government services, such as to renew a driver's license or similar state-provided services, either via a "portal site" (which would eventually direct them to a "transaction site") or via direct access to the "transaction site."

59.     Once on the "transaction site," consumers could purchase pdf guides on the advertised government service and the OPG Entities would collect the consumers' personal contact and credit card information.

60.     Through either way of access (portal or transaction site), the consumers would then see links purporting to contain information entitled "Obtain Your . . . Guide," followed by text promoting the site as being a "comprehensive source" for obtaining "all" requisite government services.

61.     On neither kind of site were the consumers able to obtain the advertised services, as advertised.  Moreover, although some of the sites contained language in small print at the bottom, purporting to advise consumers that they, in fact, would have to go to their state's DMV services website and providing various links for same, none of the sites indicated which of those links were the official State DMV websites, as opposed to third-party websites or applications.

62.     In total, during the relevant time period, the OPG Entities' ninety-seven (97) "paid guide" businesses earned $85,470,480.06 through these practices.

63.     Throughout this time period, some of the OPG Entities' advertising accounts with Google and Bing were shut down after being determined to be "high risk" to consumers and with a high probability of scam/fraud.  Other similar third-party service providers, such as Visa, alerted

the OPG Entities that its chargeback rates, based on successful consumer disputes to transactions, exceeded acceptable industry chargeback rates.  These facts became known to Defendants.

Representation of Burton Katz in the Acquinity Matter and
Actual Knowledge of the 2014 Permanent Injunction

64.     On June 16, 2014, the FTC filed an amended civil Complaint against Acquinity Interactive, LLC ("Acquinity"), Burton Katz ("Katz"), and others, in the Acquinity Matter alleging, among other things, that Katz, through Acquinity, engaged in deceptive and unfair "cramming" on mobile phone bills.  *See* Acquinity Matter, ECF No. 135 at p. 2.  The FTC further alleged that Katz and his business operation tricked consumers into signing up for costly phone bill subscriptions through websites that offered free merchandise in exchange for consumers' phone numbers.  Katz's operation then enrolled the consumers in unwanted premium text messaging services that charged them monthly.  The only mention of the charges appeared in separate hyperlinked pages or in small print and locations where consumers were unlikely to notice.  *See id*.

65.     In or about July 2014, Katz retained Linda Goldstein, then an attorney employed by the law firm, Manatt, Phelps & Phillips, LLP, to represent him in the Acquinity Matter proceedings.  At the time, Defendant Melton was also working as an attorney employed by Manatt, Phelps & Phillips, LLP and was involved in representing Katz in the Acquinity Matter.

66.     On or about October 16, 2014, the District Court presiding over the Acquinity Matter entered a Stipulated Final Judgment and Order for Permanent Injunction ("2014 Permanent Injunction") against Katz and Acquinity.  *See* Acquinity Matter at ECF No. 132.  Katz's attorney, Linda Goldstein, agreed to the terms of the 2014 Permanent Injunction and jointly with the FTC sought and agreed to its entry.  *See* Acquinity Matter at ECF No. 128.

67.     The 2014 Permanent Injunction prohibited Katz from, among other things, "making, or assisting others in making, expressly or by implication, any false or misleading representation including representations concerning the cost, performance, efficacy, nature, characteristics, benefits, or safety of any product or service, or concerning any consumer's obligation to pay for charges for any product or service." _See_ Acquinity Matter, ECF No. 132 at 2.  The 2014 Permanent Injunction also subjected Katz to ongoing compliance monitoring.  _See id._ at 7-12.

68.     On or about March 14, 2017, attorneys Linda Goldstein and Defendant Melton left their employment with the law firm Manatt, Phelps & Phillips, LLP and began their employment with Baker.

69.     As such, attorney Linda Goldstein's and Defendant Melton's actual knowledge of the 2014 Permanent Injunction and the terms and restrictions it imposed on Katz and his businesses became knowledge of and was imputed to Baker upon their employment with Baker.

<u>Defendants' Representation of the OPG Entities Related to Compliance Matters</u>

70.     At all times material to this action, and throughout the OPG Entities' actions as alleged in the foregoing paragraphs, the Defendants held themselves out to be experienced in representing individuals and entities in connection with the FTC Act and related laws and with legal compliance reviews and analyses and represented the OPG Entities for this purpose.

71.     In or about May 2017, the OPG Entities retained Defendant Melton and the Baker firm to conduct a compliance analysis and assess the legal risks of their business models and websites to determine whether they complied with applicable laws.

72.     In or about May 2017, Melton and other partners and associates of Baker conducted a legal compliance analysis of the OPG Entities' business model.  Defendants Baker and Melton failed to raise any substantive concerns regarding the business model.

73.     In addition, throughout May and June 2017, Melton prepared numerous correspondence on Baker letterhead and directed to Brent Levison, in Miami, Florida, at OnPoint Global-related entities, PBJ Media, LLC, MBL Media, Ltd, and Rogue Media Services, LLC, in which she provided "assess[ment of] the legal risk of a new business model" which would provide online "concierge services" to residents of certain enumerated states, in order to process those residents' renewals of vehicle registrations.

74.     Melton concluded that her "legal research did not uncover any legal challenges to this type of business model, either in connection with private legal actions or with governmental enforcement agencies."  She further opined that the business model presents a "low legal risk," if certain disclosures were made on the websites.

75.     Later, in September, 2017, Charlie Eissa, on behalf of the OPG Entities, requested that Defendant Melton and Baker conduct a "thorough legal and compliance review" of the entire business models and websites specifically requesting that the review and counsel provided by Melton and Baker "ensure total compliance".  Defendant Melton acknowledged that "[t]his is a large scale compliance review".

76.     Specifically, Defendant Melton and Baker were asked to and agreed to review 16 web properties and marketing processes for website disclaimers, data collection, landing pages site content, the Guide, text communications, and e-mail communications.  Both Freemium and paid-guide websites were provided for review in substantially the form found non-compliant by the Court in the FTC Enforcement Action.  In breach of the standard of care, Melton and Baker failed

22

to provide advice necessary to bring the 16 web properties reviewed into compliance with the FTC Act.

77.     When Melton moved from Baker to Crowell in late 2018, Melton and other lawyers employed by Crowell continued to provide FTC Act compliance work.  While at Crowell, in April and May 2019, Melton conducted an "extensive compliance review" of forty-eight Freemium sites and only made revisions or comments to four of the sites leading the OPG Entities to believe that almost all of the Freemium sites were compliant with all applicable law.

78.     In breach of the standard of care, at no time did Melton or Baker raise any concerns about the OPG Entities' business model including the Freemium or paid-guide business despite their supposedly thorough legal and compliance review of same.

79.     Furthermore, despite Melton and Baker's actual knowledge of the 2014 Permanent Injunction and the restrictions it imposed and compliance it required, at no time did Melton or Baker acknowledge or alert the OPG Entities or explain the increased risks and scrutiny attendant to the 2014 Permanent Injunction which applied to and imposed restrictions on Katz as well as the OPG Entities as companies formed and operated by Katz or otherwise include in their advice compliance counseling as it related to the 2014 Permanent Injunction.

80.     On April 5, 2019, Melton provided Crowell's "Compliance Monitoring Program" to On Point Global: an ongoing compliance monitoring program to "ensure that OnPoint Global, LLC complies with applicable laws and regulations and thereby reduces the risk of government investigations, consumer claims and partner indemnity demands."  Crowell further proposed a schedule to continually review the websites and marketing materials in order to flag any compliance issues.

81.     Thereafter, Crowell provided compliance counseling to OPG Entities.  Crowell represented that such counseling included an Initial Comprehensive Review of websites and provided tracking of the websites reviewed and supposed periodic reviews.  Until the time that the FTC brought suit against the OPG Entities in December of 2019, alleging violations of the FTC Act based on the OPG Entities' business model and deceptive websites, Defendants failed to provide advice that would correct violations of the FTC Act.

82.     Melton also provided "legal training" to the OPG Entities on or about March 11, 2019, which included a PowerPoint presentation reflecting that Melton provided information to the OPG Entities regarding basic consumer protection principles, telemarketing law, lead generation issues, .com disclosures, CAN-SPAM, and privacy and data security.

83.     At no time did Melton or Crowell raise any concerns about the OPG Entities' business model despite their purported thorough legal and compliance review and the training provided to the OPG Entities as to same.

84.     Furthermore, as discussed *supra*, despite Melton's actual knowledge of the 2014 Permanent Injunction, which is imputed to Crowell, and the restrictions it imposed and compliance it required, at no time did Melton or Crowell acknowledge or alert the OPG Entities or any of their principals of the Acquinity Matter proceedings or the 2014 Permanent Injunction which applied to and imposed restrictions on Katz as well as the OPG Entities as companies formed and operated by Katz.

<u>The OPG Entities' Violations of the FTC Act</u>

85.     Section 5(a) of the FTC Act, under which the FTC sued the OPG Entities, and all Defendants named in the FTC Enforcement Action, prohibits the use of "unfair and deceptive acts or practices in or affecting commerce."

86.     In its September 29, 2021 Order on Cross Motions for Summary Judgment, the Receivership Court conducted its section 5(a) analysis pursuant to a three-pronged test: "(1) there was a representation or omission; (2) the representation or omission was likely to mislead consumers acting reasonably under the circumstances; and (3) the representation or omission was material."  FTC Enforcement Action, ECF 528 at p.12.

87.     As determined by the Receivership Court relating to the illegal paid-guide businesses:

> "Renew your License."  "Renew Car Registration."  On Point made these statements and others like them on their paid-guide-related websites.   Taken alone, these representations could lead a reasonably prudent consumer to believe that they were going to renew their license or car registration on these websites.   But consumers did not receive these services.  Rather, for nearly $30 each, consumers received a pdf guide with information that could otherwise be accessed for free from the government.  Moreover, the guide websites contained notable omissions—the sites omitted any disclosures that informed consumers that they were not receiving the services above.  [Emphasis in original]

88.     The Receivership Court determined that the representations and omissions on the websites were material and noted that the FTC produced evidence that consumers did rely on the misrepresentations and omissions, customers complained, and third-party search-engine entities and credit card issuers suspended the OPG Entities' accounts.  Defendants represented the OPG Entities throughout the applicable time of the violations, reviewed the offending websites, and failed to provide advice to the OPG entities to remove the misleading statements or correct any omissions of material facts.

89.     The Receivership Court also determined that the representations and omissions were likely to mislead reasonable customers, as highlighted by the FTC's following evidence: (1) a chargeback threshold that was so high that the OPG Entities' accounts breached payment

processors' thresholds sixty-four times over three years; (2) customer complaints both by phone and online, all of which the OPG Entities worked to hide; (3) four consumer affidavits and hundreds of consumer complaints; and (4) the third-party search engines' shutdowns of the OPG Entities' accounts due to designations as "high risk" and "high probability of scam/fraud."

90.     At all times material hereto, Defendant Melton either on behalf of Baker and then on behalf of Crowell provided continuous compliance advice, review, and work for the OPG Entities, and was aware or should have been aware of the deceptive nature of the OPG Entities' business model and websites, as evidenced by the significant "red flags" surrounding the OPG Entities' conduct during the time when the Defendants were purportedly ensuring the OPG Entities' compliance with controlling law.

   The FTC's Motion for an Order to Show Cause Why Katz and the OPG Entities
   Should Not Be Held in Contempt for Violations of the 2014 Permanent Injunction

91.     On February 12, 2020, in the Acquinity Matter, the FTC filed a Motion for an Order to Show Cause Why Katz and the OPG Entities Should Not Be Held in Contempt for their violations of the terms of the 2014 Permanent Injunction.  *See* Acquinity Matter ECF No. 135.

92.     The FTC alleged, among other things, that Katz and On Point Global, LLC as well as twelve (12) entities associated with and/or subsidiaries of On Point Global, LLC (the "Contempt Defendants") operated a deceptive business that, much like the prior business model that was the subject of the Acquinity Matter, used deceptive websites to lure consumers into giving up money and personal information in direct violation of the terms of the 2014 Permanent Injunction.  *See* Acquinity Matter, ECF No. 135 at p.2.

93.      Katz retained Defendant Baker attorney Linda Goldstein to represent him in the Acquinity contempt proceedings.

26

94.     On September 29, 2021, the Court in the Acquinity Matter (the "Contempt Court") entered its Order on Motions for Summary Contempt [Acquinity Matter at ECF No. 225] which granted in part the FTC's Motion for Summary Contempt as to the Contempt Defendants and as to Katz and Brent Levison, holding these Defendants in contempt for violating the terms of the 2014 Permanent Injunction.

95.     As to Katz, the Court found, among other things, that Katz: (1) was bound by the 2014 Permanent Injunction; (2) had actual notice of it and its restrictions and requirements; and (3) played an active role at On Point Global, LLC and, as such, he had sufficient management and control or power to prevent the OPG Entities from making false or misleading material representations which led to their violation of the 2014 Permanent Injunction.  Thus, Katz violated the terms of the 2014 Permanent Injunction and was held in contempt.  *See id.*

96.     As to the Contempt Defendants, which included On Point Global, LLC, the Contempt Court found, among other things, that each entity: (1) had actual notice of the 2014 Permanent Injunction as imputed through Katz and Brent Levison; and (2) acted in active concert or participation with Katz as each entity had a specific role in assisting Katz carry out the deceptive scheme.  As such, the Contempt Court found the Contempt Defendants violated the terms of the 2014 Permanent Injunction and held them in contempt.  *See id.*

97.     As to damages, the Contempt Court deferred ruling on the appropriate relief until after the show-cause hearing which was scheduled for the trial-period beginning on October 25, 2021.  *See id.*

98.     Ultimately, in conjunction with the Verdict and Order Following Non-Jury Trial entered in the FTC Enforcement Action and the contempt findings in the Order on Motions for

Summary Contempt, the Receivership Court set contempt damages in an amount not to exceed $102,768,235.47, with the final amount to be determined by the Claims Process as outlined *supra*.

99.     As discussed herein, the Defendants had actual knowledge of the 2014 Permanent Injunction and its restrictions and requirements.  Despite having actual knowledge of the 2014 Permanent Injunction and that Katz and the OPG Entities were in violation of same, the Defendants failed to competently counsel the OPG Entities as to the risks presented by the business models and the violation of the restrictions of the 2014 Permanent Injunction and the consequences thereof directly causing and contributing to the harm incurred by the OPG Entities by way of the Courts' findings in both the Acquinity Matter and the FTC Enforcement Action.

<u>The Defendants Breached their Fiduciary Duties to the OPG Entities</u>

100.     As attorneys for the OPG Entities, the Defendants owed a fiduciary duty to the OPG Entities to, among other things, exercise diligence and care in assuring that the OPG Entities operated in compliance with the law and within the terms of the 2014 Permanent Injunction and in the best interests of the OPG Entities and their investors and customers.

101.     In their fiduciary capacities, the Defendants permitted, and, indeed, advised the OPG Entities to operate in violation of the law and in violation of the 2014 Permanent Injunction. As set forth above and more fully described below, the Defendants failed to counsel the OPG Entities that their business models violated both the FTC Act and the 2014 Permanent Injunction.

102.     The Defendants failed to counsel the OPG Entities that their business model violated the FTC Act, that the websites were deceptive, and that, unless the OPG Entities changed their model, the OPG Entities would be operating in violation of the FTC Act and the 2014 Permanent Injunction.  Instead of warning them of the risks and providing competent advice to bring the business into compliance, the Defendants counseled the OPG Entities to continue to

operate in violation of the FTC Act and the 2014 Permanent Injunction, until a Receiver was appointed by the Court in the FTC Enforcement Action.

103.    The Defendants failed to provide reasonably prudent advice under the circumstances.

104.    As a result of Defendants' negligence, the OPG Entities suffered substantial harm.

105.    One of the duties of the Receiver is to bring claims against third parties on behalf of the OPG Entities and for the benefit of the OPG Entities' creditors and customers.  This lawsuit is brought pursuant to that duty.

106.    All conditions precedent to the bringing of this action have been performed or satisfied or have occurred.

**COUNT ONE**

**LEGAL MALPRACTICE AGAINST MELTON**

107.    Plaintiff hereby reasserts the allegations set forth in paragraphs 1 through 106 as if fully set forth herein.

108.    An attorney-client relationship existed between the OPG Entities and Defendant Melton in that the OPG Entities retained Melton to perform legal services related to the implications of the FTC Act on their businesses and their compliance therewith.  Melton, individually as a partner at Baker and then as a partner at Crowell, performed legal services for the OPG Entities at times from 2017 through at least December 2019.

109.    As described herein, Melton, while a partner at Baker, also represented Katz in the Acquinity Matter, and as such had full knowledge of the implications of the 2014 Permanent Injunction on Katz, the CEO of the OPG Entities, and on the OPG Entities.

110.    As a result of the attorney-client relationship between the OPG Entities and Defendant Melton from 2017 until the date the Receivership commenced, Melton owed a duty of care and skill to the OPG Entities, including a duty to fully, fairly, and competently represent the OPG Entities in connection with the implications of the FTC Act and the 2014 Permanent Injunction on their businesses and their compliance therewith.

111.    Melton owed duties to the OPG Entities to, among other things, exercise ordinary care, skill and knowledge that members of the legal profession ordinarily possess, give competent legal advice about the law and the consequences of violations of the FTC Act and other regulatory requirements, and assist the OPG Entities by fully researching the OPG Entities' business model and the application of the FTC Act: (i) to determine whether the OPG Entities could continue to operate under their current business model without violating the FTC Act; (ii) to determine whether the OPG Entities were exposed to the risk of damages as a result of the FTC Act; (iii) to provide adequate warnings to the OPG Entities regarding the legal implications of their ongoing operations; (iv) to provide advice and counsel regarding if and how the business could be made compliant with the FTC Act and the Orders entered in the Acquinity Matter; and (v) to provide competent, responsible legal advice in light of and in connection with the FTC investigation and Enforcement Action.  Melton had a duty to perform the aforementioned duties with the care, skill, and diligence that are ordinarily employed by attorneys in the profession.

112.    As detailed in paragraphs 44-53, 70-84, and 99-102 of this Amended Complaint, Melton failed to exercise the duty of care ordinarily employed by attorneys who are in their profession when performing legal services for the OPG Entities in advising the OPG Entities in connection with the FTC Act, the common law, and the 2014 Permanent Injunction.  Defendants knew or should have known that the OPG Entities' business model and websites violated the FTC

Act, common law, and the 2014 Permanent Injunction.  A competent attorney using ordinary care would have effectively warned the OPG Entities that they could not continue to operate under their then-current business model without running afoul of the law or major redesign of the websites.

113.    This failure to exercise ordinary care as set forth throughout this Amended Complaint amounted to a breach of Melton's duty of care arising from the OPG Entities' engagement of Melton to perform legal services for them, including a comprehensive review of their business models' and websites' compliance with the FTC Act and the Acquinity Orders.

114.    As a result of Melton's breach of her duty to the OPG Entities, the OPG Entities sustained significant damages and loss.  Specifically, the OPG Entities' damages include the imposition of compensatory contempt sanctions which have already totaled over $19 million, with the final amount to be determined by the Claims Process, together with the Receivership fees and costs incurred and attorneys' fees and costs incurred to defend the OPG Entities in the FTC Enforcement Action and the Acquinity Matter.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for the OPG Entities, hereby demands judgment against Defendant Melton for the total amount of damages resulting from the legal malpractice, breaches of fiduciary duty, and breaches of contract by Melton, and such further relief as this Court deems to be appropriate and just.

## COUNT TWO

## LEGAL MALPRACTICE AGAINST BAKER

115.    Plaintiff hereby reasserts the allegations set forth in paragraphs 1 through 106 as if fully set forth herein.

116.    An attorney-client relationship existed between the OPG Entities and Defendant Baker in that the OPG Entities retained Baker to perform legal services related to the implications

of the FTC Act on their businesses and their compliance therewith, and later, to represent the OPG Entities in connection with the FTC Enforcement Action and contempt proceedings in the Acquinity Matter.  Baker, through individual representatives, performed work for the OPG Entities at times from 2017 through at least December 2019.

117.    As described herein, Baker also represented Katz in the Acquinity Matter, and as such had full knowledge of the implications of the 2014 Permanent Injunction on Katz, the CEO of the OPG Entities, and on the OPG Entities.

118.    As a result of the attorney-client relationship between the OPG Entities and Defendant Baker from 2017 to the date the Receivership commenced, Baker owed a duty of care and skill to the OPG Entities, including a duty to fully, fairly, and competently represent the OPG Entities in connection with the implications of the FTC Act and the 2014 Permanent Injunction on their businesses and their compliance therewith.

119.    Baker owed duties to the OPG Entities to, among other things, exercise ordinary care, skill and knowledge that members of the legal profession ordinarily possess, give competent legal advice about the law and the consequences of violations of the FTC Act and other regulatory requirements, and assist the OPG Entities by fully researching the OPG Entities' business model and the application of the FTC Act: (i) to determine whether the OPG Entities could continue to operate under their current business model without violating the FTC Act; (ii) to determine whether the OPG Entities were exposed to the risk of damages as a result of the FTC Act; (iii) to provide adequate warnings to the OPG Entities regarding the legal implications of their ongoing operations; (iv) to provide advice and counsel on if and how the business could be made compliant with the FTC Act and the Orders entered in the Acquinity Matter; and (v) to provide competent, responsible legal advice in light of and in connection with the FTC investigation and Enforcement

Action.  Baker had a duty to perform the aforementioned duties with the care, skill, and diligence that are ordinarily employed by attorneys in the profession.

120.    As detailed in paragraphs 44-48, 70-76 and 99-102, of this Amended Complaint, Baker failed to exercise the duty of care ordinarily employed by attorneys who are in their profession when performing legal services for the OPG Entities in advising the OPG Entities in connection with the FTC Act, the common law, and the 2014 Permanent Injunction.  Baker knew or should have known that the OPG Entities' business model and websites violated the FTC Act, common law, and the 2014 Permanent Injunction.  A competent attorney using ordinary care would have effectively warned the OPG Entities that they could not continue to operate under their then-current business model without running afoul of the law or major redesign of the websites.

121.    This failure to exercise ordinary care as set forth throughout this Amended Complaint amounted to a breach of Baker's duty of care arising from the OPG Entities' engagement of Baker to perform legal services for them, including a comprehensive review of their business models' and websites' compliance with the FTC Act and the Acquinity Orders.

122.    As a result of Baker's breach of its duty to the OPG Entities, the OPG Entities sustained significant damages and loss.  Specifically, the OPG Entities' damages include the imposition of compensatory contempt sanctions which have already totaled over $19 million, with the final amount to be determined by the Claims Process, together with the Receivership fees and costs incurred and attorney's fees and costs incurred to defend the OPG Entities in the FTC Enforcement Action and the Acquinity Matter.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for the OPG Entities, hereby demands judgment against Baker for the total amount of damages resulting from the legal

malpractice, breaches of fiduciary duty, and breaches of contract by Baker, and such further relief as this Court deems to be appropriate and just.

## COUNT THREE

## LEGAL MALPRACTICE AGAINST CROWELL

123.    Plaintiff hereby reasserts the allegations set forth in paragraphs 1 through 106 as if fully set forth herein.

124.    An attorney-client relationship existed between the OPG Entities and Defendant Crowell in that the OPG Entities retained Crowell to perform legal services related to the implications of the FTC Act on their businesses and their compliance therewith.  Crowell, through individual representatives, performed work for the OPG Entities at times from 2018 through at least December 2019.

125.    As described herein, Melton also represented Katz in the Acquinity Matter and as such had full knowledge of the implications of the 2014 Permanent Injunction on Katz, the CEO of the OPG Entities, and on the OPG Entities, which knowledge is imputed to Crowell.

126.    As a result of the attorney-client relationship between the OPG Entities and Defendant Crowell from late 2018 to the date the Receivership was commenced, Crowell owed a duty of care and skill to the OPG Entities, including a duty to fully, fairly, and competently represent the OPG Entities in connection with the implications of the FTC Act and the 2014 Permanent Injunction on their businesses and their compliance therewith.

127.    Crowell owed duties to the OPG Entities to, among other things, exercise ordinary care, skill and knowledge that members of the legal profession ordinarily possess, give competent legal advice about the law and the consequences of violations of the FTC Act and other regulatory requirements, and assist the OPG Entities by fully researching the OPG Entities' business model

and the application of the FTC Act: (i) to determine whether the OPG Entities could continue to operate under their current business model without violating the FTC Act; (ii) to determine whether the OPG Entities were exposed to the risk of damages as a result of the FTC Act; (iii) to provide adequate warnings to the OPG Entities regarding the legal implications of their ongoing operations; (iv) to provide advice and counsel on if and how the business could be made compliant with the FTC Act and the Orders entered in the Acquinity Matter; and (v) to provide competent, responsible legal advice in light of and in connection with the FTC investigation and Enforcement Action.  Crowell had a duty to perform the aforementioned duties with the care, skill, and diligence that are ordinarily employed by attorneys in the profession.

128.    As detailed in paragraphs 49-53, 77-84 and 99-102, of this Amended Complaint, Crowell failed to exercise the duty of care ordinarily employed by attorneys who are in their profession when performing legal services for the OPG Entities in advising the OPG Entities in connection with the FTC Act, the common law, and the 2014 Permanent Injunction.  Crowell knew or should have known that the OPG Entities' business model and websites violated the FTC Act, common law, and the 2014 Permanent Injunction.  A competent attorney using ordinary care would have effectively warned the OPG Entities that they could not continue to operate under their then-current business model without running afoul of the law or major redesign of the websites.

129.    This failure to exercise ordinary care as set forth throughout this Amended Complaint amounted to a breach of Crowell's duty of care arising from the OPG Entities' engagement of Crowell to perform legal services for them including, a comprehensive review of their business models' and websites' compliance with the FTC Act and the Acquinity Orders.

130.    As a result of Crowell's breach of its duty to the OPG Entities, the OPG Entities sustained significant damages and loss.  Specifically, the OPG Entities' damages include the

imposition of compensatory contempt sanctions which have already totaled over $19 million, with the final amount to be determined by the Claims Process, together with the Receivership fees and costs incurred and attorney's fees and costs incurred to defend the OPG Entities in the FTC Enforcement Action and the Acquinity Matter.

WHEREFORE, Plaintiff, Melanie E. Damian, as the Receiver for the OPG Entities, hereby demands judgment against Crowell for the total amount of damages resulting from the legal malpractice, breaches of fiduciary duty, and breaches of contract by Crowell, and such further relief as this Court deems to be appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues and claims so triable.

Dated: November 14, 2022

Respectfully submitted,

/s/ Kenneth Dante Murena
Thomas A. Culmo, Esq.
Florida Bar No. 775479
Kenneth Dante Murena, Esq.
Florida Bar No. 147486
DAMIAN & VALORI LLP | CULMO TRIAL ATTORNEYS, P.A.
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965
Email: tom@culmolaw.com
          kmurena@dvllp.com

*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver of*
*On Point Global LLC, et. al.*

36